Good morning, Your Honor. Sharon Healy on behalf of Pastor Romero-Rodriguez. I think in this case, this is a situation where the issues here are the applicant's eligibility for withholding of removal and relief under the torture convention. In this case, the immigration judge's adverse credibility finding, which precluded him from being eligible for that relief, the immigration judge did not reach any other issues, or the board did not reach any other issues in the immigration judge's decision other than... Counsel, do you agree that this is a post-real ID case to which the new statute applies? Yes, I do. Okay. So it's a little harder for you to prevail than it would be under previous law? Yes. It is harder to prevail because under the Real ID Act, whereas previously inconsistencies had to go to the absolute heart of the matter, here any alleged inconsistencies in the testimony could be used in considering the opinion. So I am aware that the burden on the respondent is made more difficult with regard to the burden of proof post-Real ID Act. But I want to talk about some of the inconsistencies. First of all, the board has cited two inconsistencies in support of the judge's adverse credibility finding, which was the basis for them upholding the denial of the relief for withholding removal. And the first one is the rape. The board said during his hearing, his testimony, during his written declaration, respondent, the judge indicated he was raped three times in Honduras. During his hearing, he testified that he was raped one time and then stated he was raped twice. You know, I think this is really disingenuous on the part of the board to make such a finding because Petitioner's actual testimony on page 16 was where he said, how many times were you raped? Okay, once. Actually, it was twice. This was in the same sentence. There was no need to ask. So the board's indication that he testified first, raped once, and then twice is just an inaccurate characterization of respondent's testimony. And with regard to the alleged third rape in the respondent's declaration, we pointed out that there were two incidents of rape. In the second incident, the respondent testified that he was raped twice. So it could be, I mean, so that is easily understandable as saying two incidents of rape, one in which there were two perpetrators, the first perpetrator and the perpetrator's brother. So furthermore, he's testifying about occurrences that happened when he was 12 years old, some 24 years prior to his hearing. With regard to the other basis of the adverse credibility finding, the only issue was he testified to being shot with a gun, and the adverse credibility finding was made on the fact that he testified, his declaration was inconsistent with his testimony as to when that actually occurred. And the judge then found that he didn't meet his burden of proof and then reflected that it wasn't indicated in the medical records. But in this case, a failure to meet a burden of proof is being confused with an adverse credibility finding. So it's one thing to say that he failed to meet his burden of proof because he didn't support his medical records on this issue. He'd still have past persecution based on the rapes. And another to say that, you know, we have an adverse credibility finding. The only inconsistency in his testimony and his declaration was with the time in which the gunshot occurred. And he did indicate that he is a man testifying to things that happened many years previously. He's a man on a lot of medication with full-blown AIDS. You identify these two, you've addressed these two issues that the IJ, the BIA actually notes in their decision. Yes, Your Honor. Do you, is it your position that that's the only basis on which the BIA relied to uphold the IJ's adverse credibility determination? Well, since the BIA, this is all that we can look at since the BIA Well, the BIA, but we, you know, there was a, the IJ also found other inconsistencies, correct? No. I mean, if you look at the record, what are the other inconsistencies that the IJ stated to? They say numerous inconsistencies, but if you go to the record, it's pretty brief. And the inconsistencies were that he was, he testified that he was shot, he thought, in 1985, but his, actually his declaration says, I think, 1992. And, and then, and that's the only inconsistency that the IJ cited. There's some, if you look at the Well, I'm not sure if this was Judge Piazza's question, but it's mine. Do you think that we can look at all the inconsistencies that the immigration judge mentioned, or only the one that's important? The reason that's important is that sometimes the BIA will say, well, the IJ gave three reasons, but we only agree with number two. In this case, they simply said there, there are many occasions on which there was inconsistency and gave examples, and so it's a little different. Okay. Well, there, I think there are two parts of that question. First, the first part is whether the characterization of many inconsistencies is even accurate, and it's not. The record does not reflect that. Well, the basic part of my, my basic question is, can we look at everything the IJ said also? Just trying to answer both parts. One is, it's inconsistent, and two, even if there were, which there are not, were other inconsistencies, you're limited to the BIA decision here. Right, but the BIA, you're still not answering my question, because the BIA said that the immigration judge had identified many inconsistencies, and the BIA said, for example, and then gave examples. Do you read that as incorporating everything the IJ said and just giving examples, or a limitation? If the Board of Immigration Appeals is incorporating the IJ decision, it must specifically state that it's incorporating the IJ decision, and there's no such incorporation, so this is a stand-alone decision. There are, it's, it's not, it's, it could have affirmed the IJ decision in its entirely, it could have incorporated the IJ decision, in which it would have needed to say so, or it can make its own stand-alone decision, which is what it's done, in which case only the IJ decision can be relied on. And so then, we're, we're limited to the reasons and facts stated in the IJ decision, which precludes anything else that the, I mean, in the Board decision, which limits, limits the scope of the issues on appeal. And here we've got two inconsistencies cited, and those inconsistencies, one is just completely disingenuous, and the other one is, is not an, the other one is an inconsistency, yes, but the issue then becomes, you know, is it a, is it, is that single inconsistency, is it, is that on one incident regarding the time difference enough to make an overall adverse credibility finding against this respondent? I say that it's not. I'd like to also address the denial of the claim for cat relief. Well, let me ask you a question before you get to cat relief. Do you contend that the that he is, a fear of future persecution because he would be sent back to a country that does not provide medication for people who are HIV positive? I think that that issue is raised. However, the BIA did not reach that issue. So, if that, if the adverse credibility finding is overturned, then... Well, whether it's overturned or not, that does not seem to be an issue that depends on his credibility. That's an issue either addressed in other documents. The, I mean, his personal life story is a credibility issue. The question of whether there are, whether drugs in Guatemala are adequate and are provided to HIV positive people is not dependent on his personal credibility. That is a fear of future persecution. It's actually Honduras. Honduras, yeah. And that does go to his fear of future persecution. And that is part of his claim, his claim in a poor country, government action that is punitive, that constitutes torture, or is it just being in a poor country? Well, I think that you have to look a little bit beyond that in terms of how it's, I mean, if poor medical care is specifically, you know, I don't think you can separate the poor medical care in this case from the fact that it's care for somebody who's gay and HIV positive. So if you are talking about just general poor medical care... So if a country decides that they'd rather spend their money on measles vaccines than on AIDS treatment, that's torture, potentially? No, I don't think that, that, I think that, I don't think that is it. But I think if people are being turned away and not being allowed to be treated medically because they are HIV positive, and people that are HIV positive are discriminated against and unable to get jobs where they could get insurance, I think you have to go beyond, it's not a blanket statement just because they make a choice of where to put their money, it's how it's actually done in a particular country, and there are plenty of country conditions that would... But is there any position here, you're not asking us to rule on the merits, you're saying that the board did not reach that issue? The board didn't reach the merits of his case because the board uphold the adverse credibility finding, and so because of that, they didn't, the board did not actually look at whether or not he would be eligible had he been found credible. I mean, at least that's my reading, they just limited to the adverse credibility finding with regards to withholding. So I think in this case, that issue was just, they could have said in the alternative, had... The BIA did reach that without mentioning credibility. While the problems attendant to treating HIV in Honduras may be vexing, we find the respondent has not shown that this rises to the level of torture so as to come within the ambit of protection under the CAT. They're not saying he's not credible. You're talking about CAT relief and I'm talking about withholding. Oh, I'm sorry, I thought you were talking about CAT relief. No, I'm sorry, because they're two different things. For withholding, you can't get withholding if you are found to be adversely credible. However, under CAT, you can because it's, you know, there's case law that says that it's separate. So what I was saying was with regard to the withholding issue first... So are you saying that as to the withholding, the persecution as opposed to torture, that you concede that as to withholding, even though there is persecution in the country in general, that if he is not credible, he cannot receive withholding? Well, if the judge made a more limited ruling, because sometimes immigration judges limit the ruling to an adverse credibility finding on this issue, but in this case, the judge basically made a blanket adverse credibility finding. So then, you know, what part of his evidence is credible or not credible? Is his part of his evidence regarding the country condition viewed credible or not credible? I think in this case, you know, it's a difficult issue. So you are not arguing that even though you've raised an issue as to the country's withholding of medical care, and the gays do not receive, or people who are HIV positive do not receive medical care, you are saying that unless the credibility finding as to his personal experience is reversed, we can't reach that issue? You can under the C.A.T. claim. No, no, not under the C.A.T. claim. I'm talking about the withholding claim. You are not asserting any withholding claim unless the credibility finding is reversed. Well, I think that that is probably, I mean, my understanding... All right, that's fine. I just want to understand your claim. That his credibility would match his withholding claims, but not his C.A.T. claims. All right, okay. And I think that the issue of the medical treatment really belongs under the C.A.T. claim, because then you get to the issue, which was not addressed in the BIA, of, well, what's the particular social group that he's in? Well, under C.A.T., you don't have to claim that you're a particular social group. If it falls within the broader parameters of the C.A.T. claim, then it's fine. And the credibility claim is irrelevant under C.A.T. Thank you, Katherine. That's my time up. You've gone over by about five minutes. Oh, sorry. I apologize. Good morning, Your Honors. Good morning, Ms. Haley. May it please the Court, I'm Joseph Hardy for the Attorney General. To begin, Ms. Haley and I appear to both agree, the only issues are the adverse credibility determination with respect to the withholding claim and the merits of the claim for protection under C.A.T., protection under the Convention Against Torture, excuse me. The adverse credibility determination does infect the entire withholding claim. Substantial evidence supports the immigration judge's adverse credibility determination. As you note, the immigration judge cited numerous inconsistencies. The Board, I believe that you should be reviewing both the immigration judge's decision and the Board's decision. The Board just said, for instance, Judge Graber, as you noted, it wasn't just holding itself to the one. So under Hussaini v. Gonzalez, you should be reviewing the consistencies noted by the immigration judge as well. And if you'll note, I know he states that he was on medication and that affected his memory. However, he was on medication, as far as we can tell, since July of 1999, which means he was on medication at the time he did the asylum application, he was on medication at the time he did his declaration, and he was on medication at the time of the hearing. And the only consistent testimony that he's provided is one that he's gay, one that he has AIDS, and that the only person in his family that knows he has AIDS is his sister-in-law. Everything else is either inconsistent with itself or inconsistent with things that, you know, between the other documents. The asylum application only indicates that he feared returning to Honduras because when he went downtown in his hometown, people would call him derogatory names and that they would whistle at him. Then you get to the declaration, and then you have this very detailed declaration, which indicates that he was shot in the head in 1992, and he went back, didn't go to the hospital, he went to work the next day, and just slicked his hair back and cured it with warm salt water. And then at the hearing, the immigration judge at page, two times on page 74 and once on 76 asks, is the only thing that happened to you that shooting? And he says yes. The immigration judge notes it to Petitioner's Counsel, and on page 77 she asks him, and for the first time he mentions that, oh, I was raped once or twice. Well, even then, those rapes are inconsistent with the declaration and the asylum application, as I said. He doesn't mention them in the asylum application. And in the declaration, he says that he was raped three times. You would think that even under the law prior to the REAL ID Act that you would remember these instances. This is the very heart of your claim, but under the REAL ID Act, you don't even have to go to the heart of the claim. But either way, there are clearly inconsistencies. You just didn't mention these things that are very important to your claim. And his only explanation is, I don't remember. Well, the immigration judge is not required to credit that under the REAL ID Act provisions. Credibility is not presumed.  I don't have specific evidence that he has a claim to withholding of removal. And he hasn't established it. Let me ask you one question that's bothered me about this case. The record seems to reflect that he is HIV positive and whatnot. Apart from withholding asylum and cat relief, is there any other form of humanitarian relief that's available to him from our government? And I've thought of that myself, and I've looked up a lot of things. He could seek deferred action, and I'm sure you've heard of that, where DHS, it's actually the Citizenship and Immigration Services part of DHS, could refuse to execute or decline executing the removal order. However, if you remember from American Arab Anti-Discrimination Committee, that's not something that comes to our office because it's not something that the court has jurisdiction to review. So that's completely within, I'll say, CIS, but it's DHS's purview. Is that something he could seek, I mean, he could request that kind of thing? It's something he could have... I mean, it's basically the same thing as asking them to not issue the notice to appear. It's the same thing as asking them to terminate the proceedings. I mean, he could have done this the whole time. Could he still do it today? He could still, I mean, he can do it up until the time they're trying to put him on an airplane, as far as I know. But he simply hasn't done that. We do know from the record that he had temporary protected status. And I'm thinking that's, you know, in 1998, Hurricane Mitch, if you remember, ravaged Honduras. And then, I believe January 5th of 99, Attorney General Reno designated Honduras as a country for temporary protected status. And Mr. Romero immediately applied for TPS that year. And for whatever reason, as far as we know from the brief, he just declined to re-register for it. I don't know if you've looked at the most recent Federal Register notice that shows that Honduras was re-designated for the ninth time in a row for TPS. So it sounds like he has two options open to him. One is to re-register for TPS. No, he can't do that anymore. But he can still seek the humanitarian deferral whenever he wants. And it's something that is, my office has nothing to do with it. He has to do that with, specifically, Citizenship and Immigration Services. And I mean, that's something wholly separate from this case. I'm sure you're aware of it. Can I move on to the CAC claim? Or is there any other questions about the adverse credibility determination? Okay, as far as the CAC claim, Judge Graber, I think you hit on the issue perfectly. If you're claiming that the government of Honduras is going to, you know, that you expect that you're likely to be tortured by the government of Honduras, you need to show under Villegas, and most recently there was a case, I think three months ago, Ine versus Holder, you need to show specific that the act that you're suggesting the government is going to do is specifically intended to inflict pain or suffering against you. And under Villegas, I mean, this case is, I think, squarely controlled by Villegas. We cite that in our brief. Simply that Honduras is unable to provide medication, retrovirals for Honduras. And we don't even know if he's going to be a person that won't be able to get medication in Honduras. It shows that, you know, there's a dearth of it, but it doesn't show that Honduras doesn't have medication. And I think that was the issue in Villegas. It was just that the medical, or the conditions for mental patients in that country were just deplorable. But a deplorable system is far from a specific intent on behalf of the government to torture someone. And to the extent that he says that there's a, the documents note anything going as to gays or people with HIV in Honduras, it just notes all discrimination. If you note, yes, there is a ban, I acknowledge, on same-sex marriages in Honduras. It was a constitutional provision in 2005. But at the same time, Honduras recognized approximately 80 LGBT groups there. So there's nothing to indicate that Honduras is going to, that it even wants to torture, even if it had the means to do it, people in Mr. Romero Rodriguez's position. If there are any other questions? Okay. For the reasons I've cited and the reasons in our brief, I'll ask the court to affirm the board's decision. Thank you. Thank you, counsel. The case that's argued will be submitted.
judges: Reinhardt, Graber, Paez